UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
:
GUVERA IP PTY LTD., :
:
:
Plaintiff, :
: 21-CV-4544 (JMF)
-v- :
: OPINION AND ORDER
SPOTIFY, INC., :
:
Defendant. :
:
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Guvera IP Pty, Ltd. ("Guvera"), an Australian media-streaming company, brings this patent infringement case against its better-known counterpart, the music-streaming service Spotify, Inc. ("Spotify"). Guvera alleges infringement of U.S. Patent No. 8,977,633 (the "'633 Patent"), a process for generating a pool of matched content using parameters that its "brand clients" select in order to advertise to consumers. ECF No. 38-1 ("Patent"). According to Guvera, Spotify infringes Claim 1 of the Patent by generating playlists — a type of matched-content pool — and allowing its users to stream them for free. *See* ECF No. 38 ("SAC"), ¶¶ 26, 28. Spotify now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss on the ground that the '633 Patent's claims are directed to an abstract idea and therefore ineligible for patent protection. *See* ECF No. 40 ("Def.'s Mem."), at 1. For the reasons that follow, the Court agrees and, thus, GRANTS the motion to dismiss.

## BACKGROUND

      The following facts, drawn from the Second Amended Complaint and the underlying patent, are presumed to be true for purposes of this motion. *See, e.g.*, *Karmely v. Wertheimer*, 737 F.3d 197, 199 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir.

2002) (noting that, for purposes of a Rule 12(b)(6) motion, "the complaint is deemed to include . . . documents incorporated in it by reference" or documents "integral" to the complaint (internal quotation marks omitted)).

Guvera is an Australian corporation that used to stream free music and entertainment and, as relevant here, owns the '633 patent. SAC ¶¶ 1, 6, 10. The '633 Patent, titled "System and Method for Generating a Pool of Matched Content," was issued on March 10, 2015. At a high level, the patent claims "computer implemented systems and method for generating a body of matched content from a larger pool of content based on parameters set by a particular brand client." Patent 1:14-17. The '633 Patent recites two independent claims — Claim 1 and Claim 16 — and fourteen dependent claims — Claims 2-15. *Id.* 12:57-16:31; *see also* Def.'s Mem. 3.

First, the patented method requires three databases for the process: one with consumer profiles, one with brand client profiles, and one with digital content pieces. Patent 12:62-13:5. Each entry in each database has identifying information — consumer preferences, branding parameters, and "tags" — describing characteristics of the content pieces. *Id.*; *see also id.* at 5:52-53. A brand client selects a certain number of content pieces that it determines "convey a brand identity"; they form the "Spine." *Id.* at 13:6-8, 2:41-42. The system administrator tests the Spine to ensure that, in each sample, there are (1) enough pieces; (2) multiple content creators represented in the sample; or (3) a minimum number of a particular type of content. *Id.* at 13:9-29. The content tags each have a "weighting factor," and the content pieces themselves are assigned a "quantitative value." *Id.* at 13:44-48. A computer or other data processor then uses these values to calculate "a degree of association" between the sample content that the brand client selects and the other content pieces in the database. *Id.* at 13:54-60. Although the claims do not expressly state this, the system generates a matched content pool based on the

degree of association between the sample content pieces and the other content pieces in the database; the matching content pieces form the "Ribcage." *See id.* at 2:43-47, 7:51-61.

Claims 2-15 are dependent claims that impose limitations on the process in Claim 1. For instance, the content tags can be updated in real time, and a search engine will search the content database for pieces with certain tags. *Id.* at 14:14-16, 14:25-28. The claims provide that the brand client can choose the depth of association it requires between content pieces in the Spine and those in the Ribcage when generating the matched content pool. *Id.* at 14:4-10. And the claims state that the brand client may select the sample content pieces to convey their particular identity. *Id.* at 14:17-21, 14:29-33. The specification provides further context for the patented method. It notes that "one embodiment" of the method is as an "advertising system." *Id.* at 2:65. The brand client chooses the types of content pieces that represent their brand identity, and then similar pieces will make up the Ribcage. *Id.* at 6:59-62. Together, this pool of matched content forms a branded channel. *Id.* at 2:35-64. Then, the brand client chooses its target demographics, and consumers who fit the demographic profile can stream the branded channel. *Id.* at 5:16-17, 5:28-34. The purpose of this method is to provide "non-disruptive" advertising while consumers stream free content. *Id.* at 10:28-34; *see also* ECF No. 42 ("Pl.'s Opp'n"), at 6. But the specification also notes that the method is "broadly" applicable to computer-implemented methods of matching content, not just to targeted advertising. *Id.* at 1:46-49.

Spotify is a New York-based media company that provides "the means to play streamed music, podcasts, and video to provide access to millions of songs and other content from creators around the world." SAC ¶¶ 2, 20. "An important part of Spotify's Streaming Service is the ability to provide advanced advertisement placement using detailed information about the user, the electronic content available on Spotify, and the advertisers who want to reach those users."

3

*Id.* ¶ 22.  Guvera alleges that, in doing so, Spotify infringes on Claim 1 of the '633 patent by using databases of consumers, brands, and content; creating a representative pool of content that meets branding requirements; and generating a pool of matched content by calculating a degree of association between content pieces.  *Id.* ¶¶ 26-40.

## APPLICABLE LEGAL STANDARDS

Spotify moves to dismiss the Second Amended Complaint on the ground that the claims of the '633 patent are unpatentable on their face because they are directed at an abstract idea.  *See* Def.'s Mem. 1, 5.  Thus, the only question at this stage is whether the claims are patentable.

**A.  Standard of Review**

In evaluating that question, the Court must accept all facts set forth in the Second Amended Complaint as true and draw all reasonable inferences in Guvera's favor.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008).  A claim will survive Spotify's Rule 12(b)(6) motion, however, only if Guvera alleges facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  Thus, Guvera must show "more than a sheer possibility that [Spotify] has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If Guvera's pleadings "have not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

B.  **Patent Eligibility**

As noted, the sole question here is whether the claims in the '633 Patent are patentable. Section 101 of the Patent Act authorizes inventors to obtain patents for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  Significantly, however, "laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (cleaned up); *accord Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).  That is because these are "the basic tools of scientific and technological work," *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972), and to award a patent for their discovery would risk "inhibit[ing] further discovery by improperly tying up the future use of" such tools, *Mayo Collaborative Svcs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 85 (2012).  At the same time, the Supreme Court has warned against construing this exception too broadly, "lest it swallow all of patent law."  *Alice*, 573 U.S. at 217.  An invention that applies an abstract idea or law of nature "to a new and useful end" may, therefore, be patent eligible.  *Gottschalk*, 409 U.S. at 67 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)).

To assess patent eligibility, the Supreme Court in *Alice* articulated a two-part test.  First, courts must "determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea.  *Alice*, 573 U.S. at 218.  If so, then courts must determine whether any of the claims "transform that abstract idea into a patent-eligible invention."  *Id.* at 221.

As part of *Alice*'s first step, courts must consider, "in light of [its] specification," whether the patent claims "as a whole" are directed to an abstract idea or other patent-ineligible concepts. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).  Critically, they must "articulate what the claims are directed to with enough specificity to ensure the step one inquiry

5

is meaningful." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (quoting *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017)). Neither the Supreme Court nor the Federal Circuit has defined what constitutes an abstract idea. Instead, they "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334; *see also Alice*, 573 U.S. at 221 ("[W]e need not labor to delimit the precise contours of the 'abstract ideas' category . . . ."). Since *Alice*, courts have found numerous "abstract ideas" in patent claims, including, as relevant here, using "content-based identifiers" to perform "data-management functions," *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021), and creating "targeted advertisements," *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1361-62 (Fed. Cir. 2021).

Moreover, courts have identified multiple inquiries relevant to *Alice* step one. The first is whether the claimed process "can be accomplished mentally"; if so, the claims are likely directed to an abstract idea. *Quantum Stream Inc. v. Charter Comms., Inc.*, 309 F. Supp. 3d 171, 183 (S.D.N.Y. 2018). If the patent claims an abstract "result or effect" while invoking "generic processes and machinery," then the claims are directed to an abstract idea. *Free Stream Media*, 996 F.3d at 1363 (quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)). Indeed, patent claims must "go beyond stating a functional result [and] identify how that functional result is achieved by limiting the claim scope to . . . concrete action." *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1302 (Fed. Cir. 2020) (internal quotation marks omitted). Particularly in the context of computer-based patents, courts must determine "whether the 'focus of the claims' is on a 'specific asserted improvement in capabilities, or instead, on a process that qualifies as an 'abstract idea' for which computers are

6

invoked merely as a tool.'" *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018) (quoting *Enfish*, 822 F.3d at 1336) (cleaned up).  Put differently, "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet." *Intellectual Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015).

If the main thrust of the claims is a patent-ineligible concept, then courts must proceed to *Alice* step two and consider whether the claims, "both individually and 'as an ordered combination,'" offer an "'inventive concept.'"  *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 72, 79).  The purpose of the inquiry is to determine whether the claims "amount[] to significantly more than a patent upon the ineligible concept itself." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014) (quoting *Alice*, 573 U.S. at 218) (cleaned up).  Most importantly, if the only possible "inventive concept is the application of an abstract idea using conventional and well-understood techniques," then the patent will fail at *Alice* step two.  *BSG Tech. LLC*, 899 F.3d at 1290 (internal quotation marks omitted).  It follows that implementing an abstract idea on a computer, without more, does not make otherwise ineligible claims patentable.  *See Alice*, 573 U.S. at 222 ("[C]omputer implementation did not supply the necessary inventive concept.") (citing *Benson*, 409 U.S. at 67)); *Intellectual Ventures*, 792 F.3d at 1367 ("[C]laiming the improved speed or efficiency inherent with applying the abstract idea on a computer [does not] provide a sufficient inventive concept.").  By contrast, claim limitations that direct "the non-conventional and non-generic arrangement of known, conventional pieces" comprise an inventive concept.  *BASCOM Glob. Internet Svcs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *see also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318-19 (Fed. Cir. 2019) (noting that patent claims using conventional technology in novel ways comprise an

7

inventive concept). Any inventive concept "must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).

Patent eligibility is a question of law that can involve "underlying questions of fact." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1358-59 (Fed. Cir. 2020). Thus, patent eligibility may be resolved on a Rule 12(b)(6) motion "where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); *accord Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Patents are "presumed valid," and the party challenging the patent's validity — here, Spotify — has the burden of establishing invalidity by clear and convincing evidence. 35 U.S.C. § 282(a); *see Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

## DISCUSSION

Construing the factual allegations in the Second Amended Complaint in the light most favorable to Guvera, the Court concludes that Spotify has met its burden of proving unpatentability. Taken together, and considered with the specification, the patent claims are directed to the abstract idea of matching content using data identifiers. None of the patent claims, either separately or as an ordered combination, adds an inventive concept to the abstract idea of matching content. Accordingly, the claims are not eligible for patent protection.

### A. Applying *Alice* Step One

The Court begins with step one of the *Alice* inquiry. The '633 patent claims a method for using a computer to "generat[e] a body of matched content from a larger pool of content based

on parameters set by a particular brand client." Patent 1:15-17.[1] In its own description of the claims, Guvera alleges that the patent created an improved process for matching content and displaying advertisements. SAC ¶ 11. Claim 1 then details this process. By Guvera's own account, the purpose of the patented invention is to efficiently construct a pool of matched content based on certain parameters, specifically with the goal of providing "tailored advertising." *Id.* Unfortunately for Guvera, the Federal Circuit and courts in this District have repeatedly held that patents claiming processes for matching one set of content to another using various parameters are directed to abstract ideas. *See, e.g.*, *PersonalWeb Techs.*, 8 F.4th at 1316 (patent directed to the abstract idea of using an "algorithm-generated contend-based identifier to perform . . . data-management functions" ); *Intellectual Ventures*, 792 F.3d at 1369 (patent claiming process for "tailoring information based on [user] navigation data"); *Quantum Stream*, 309 F. Supp. 3d at 184 (patent claims describe the abstract idea of "customization of products"); *cf. Ghaly Devices LLC v. Humor Rainbow, Inc.*, 443 F. Supp. 3d 421, 429 (S.D.N.Y. 2020) (holding that a patent claiming a process for matching different users on a dating app is drawn to the abstract idea of "human compatibility and matchmaking"). To provide patent protection for these types of claims would risk preempting or monopolizing a mental process.

The Federal Circuit's decision in *PersonalWeb Technologies* is illustrative. The case involved patents claiming "data-processing systems" that assigned "content-based identifier[s]" to specific pieces of data, and then used those identifiers for "various data management

---

[1] The patent *specification* claims that the primary purpose of this method is targeted advertising. Patent 3:21-24. The patent claims themselves, however, do not limit the method to advertising and, in assessing whether the patent is directed to an abstract idea, the language of the specification "must always yield to the claim language." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019). In any event, the Federal Circuit has previously found that targeted or customizable advertising constitutes an abstract idea. *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362-63 (Fed. Cir. 2020).

functions," including allowing or disallowing users to access data, retrieving specific pieces of data, and deleting duplicate data entries. 8 F.4th at 1312-13. The patented process involved "comparing the content-based identifier against . . . another content-based identifier or a request for data" in order to perform these functions. *Id.* at 1315. The Federal Circuit concluded that the claims described mental processes, "a telltale sign of abstraction." *Id.* at 1316. Each component of the process has a "pen-and-paper analogue," *id.*, and, as a result, "the claims focus on 'mere automation of manual processes using generic computers,'" *id.* at 1318 (quoting *Credit Acceptance Corp. v. Westlake Svcs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017)). The claims in the patent here reflect the same infirmities as those in *PersonalWeb Technologies*. At the highest level, the patent claims a process for matching different pieces of content based on their identifying tags, and for creating customized content streams based on set parameters. SAC ¶¶ 11, 15, 17. More specifically, the claims describe assigning identifiers or tags to each piece of content, using those identifiers to compare the content pieces to one another, and applying various parameters set by a client to generate the matched content. *Id.* ¶¶ 18-19.

As in *PersonalWeb Technologies*, each step in this process is a mental one. A human can manually tag content and update those tags; a human can compare tags of different pieces of content; a human can compile lists of content pieces with similar tags. Contrary to Guvera's contentions, *see, e.g.*, SAC ¶ 13, automating these steps does not render the process patentable; it merely makes the process more efficient, *see Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1279 (Fed. Cir. 2012). And stating that this process is computer implemented — or confined to a specific technological environment, *see Alice*, 573 U.S. at 222-23 — does not transform it into something other than an unpatentable mental process. In fact, Guvera admits that selecting the matching content — the heart of its patented process — can be

done manually, either instead of, or in addition to, the automatic selection that the patent describes. Patent 7:62-65. Taking Guvera at its word, the '633 Patent therefore claims only a mental process. *See, e.g.*, *Ghaly Devices*, 443 F. Supp. 3d at 429 ("[C]ourts 'have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category.'" (quoting *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016)).

The fact that the '633 Patent claims *results* rather than a specific method reaffirms the conclusion that it is directed to an abstract idea. *See, e.g.*, *Free Stream Media*, 996 F.3d at 1363; *Am. Axle & Mfg.*, 967 F.3d at 1302. In *Free Stream Media*, for example, the Federal Circuit found that the patent at issue attempted to claim a process for allowing devices such as cell phones and televisions to communicate by "overcoming a mobile device's security [mechanism]," but the claims failed to explain how they would do so. 996 F.3d at 1363-64. So too, in *Electric Power Group*, the Federal Circuit deemed a patent ineligible because it "defin[ed] a desirable information-based result," rather than a method of achieving that result. 830 F.3d at 1351. Specifically, the patent claimed that it would detect and analyze "events" on electrical power grids and display the results of that analysis, but it did not explain *how* to conduct that detection or analysis. *Id.* at 1351-52. Consequently, the court noted that the patent purported to claim "the abstract idea of a solution to the problem in general," an "essentially result-focused," unpatentable claim. *Id.* at 1356.

As in *Free Stream Media* and *Electric Power Group*, the claims here do not detail with sufficient specificity the process, as distinct from results. Claim 1 states that the content pieces are tagged with "content profile identifiers," but it does not describe how the tagging occurs; it further requires that the content profile identifiers and content pieces themselves are given

11

quantitative values and weighting factors, but it provides no explanation for how those are calculated. Patent 13:1-5, 13:44-53; *see Parker v. Flook*, 437 U.S. 584, 585-86 (1978) (holding, pre-*Alice*, that a patent claiming a process for updating "alarm limits" used in chemical reactions was invalid because it did "not purport to explain how to select the appropriate margin of safety, the weighting factor, or any of the other variables"). Guvera asserts that the '633 Patent teaches how to calculate a degree of association between content pieces based on the values of their content profile identifiers, but the patent does not provide instructions for doing the calculation. Patent 8:3-13; SAC ¶ 11. Put differently, the '633 Patent claims results — assignment of weighted content profile identifiers and the comparison of content pieces — without describing how to achieve them. And the dependent claims describe additional results, broadening the scope of the patent's control. Claim 7, for example, encompasses "content profile identifiers [that] are reactive in real time," Patent 14:14-16, but it fails to specify how to achieve that result. Claims 8 and 9 cover a content-matching search engine, but they do not describe how that search engine works. *Id.* at 14:22-28. They could include *any* type of search engine.[2] Lacking such specification, the claims sweep too broadly; they monopolize the result, rather than claiming one way of achieving the result. This is fatal to the patent's eligibility.

Nor does the claimed method reflect "an improvement to computer functionality." Pl.'s Opp'n 7; *see also* SAC ¶ 11. It is true that courts have drawn a distinction between a "specific asserted improvement in computer capabilities" and an improvement that merely invokes computers as a tool, and have held that the former can be patented. *Enfish*, 822 F.3d at 1335-36. *Enfish* is instructive. There, the Federal Circuit held that a patent claiming a process for creating

---

[2] The specification is even broader, claiming that "the content matching engine . . . will be located on a network of computers such as the Internet." *Id.* at 3:11-13.

a "self-referential" data table was an improvement over existing data storage systems and, thus, not directed to an abstract idea. 822 F.3d at 1336. This new type of data storage and retrieval system, the court reasoned, was a "specific implementation of a solution" to a technological problem. *Id.* at 1339. Along similar lines, in *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017), the Federal Circuit held that that a process enhancing a computer's memory system was patent-eligible under step one of the *Alice* inquiry because it was limited to a specific technological improvement. *Id.* at 1259-60; *see also Chewy, Inc. v. Int'l Bus. Machs. Corp.*, No. 21-CV-1319 (JSR), 2021 WL 3727227, at *2, *7 (S.D.N.Y. Aug. 23, 2021) (holding that a claimed process for obtaining web content while minimizing the necessary server space applied a specific method for improving computers' functionality).

    Relying on these cases, Guvera argues that the '633 Patent offers a method of providing music streaming to over one-hundred thousand consumers, using non-disruptive advertising from numerous brands, SAC ¶¶ 13, 16-17; Pl.'s Opp'n 8, and that it teaches "inventive ways of arranging databases . . . [and] inventive ways of relating this data together," SAC ¶ 14. But this is a far cry from the processes found to be patent eligible in *Enfish*, *Visual Memory*, and *Chewy*. The '633 Patent does not improve any computer function or enhance some aspect of computer hardware or software. *See Alice*, 573 U.S. at 225; *Free Stream Media*, 996 F.3d at 1364-65. Put simply, using data from three databases is not an "inventive way[] of arranging databases." SAC ¶ 14. At most, Guvera recites "a database structure slightly more detailed than a generic database," which is insufficient to support patentability at step one. *BSG Tech LLC*, 899 F.3d at 1287; *see Quantum Stream Inc.*, 309 F. Supp. 3d at 183 ("[A]t bottom, [the patents and claims] do not represent or describe improvements in computing systems, specific new software or hardware or technology, or some other type of computing method that improves the computer's

13

functionality or makes it more efficient, such as an information 'structure designed to improve the way a computer stores and retrieves data in memory.'" (quoting *Enfish*, 822 F.3d at 1339)). Indeed, Guvera acknowledges as much, noting that that the '633 Patent can be implemented using a variety of devices, including "telephones . . . computers, personal data storage devices, . . . and the like." SAC ¶ 14.  In short, the focus of the '633 Patent is the abstract idea of creating matched content and, thus, is ineligible at *Alice* step one.

Finally, Guvera's argument that the Court must conduct claim construction before ruling on eligibility is unavailing. *See* Pl.'s Opp'n 15-16.  Guvera argues that Spotify assigns specific meanings to key words in the claims, such as "content profile identifiers" and "weighting factor." *Id.*  Guvera does not, however, explain how Spotify defines these terms.  Nor does Guvera propose alternative definitions.  Although claim construction may be necessary when terms are actually in dispute, it is unnecessary when, as here, a party does not show "how it might benefit from any particular term's construction." *Simio*, 983 F.3d at 1365; *see also, e.g.*, *Quantum Stream*, 309 F. Supp. 3d at 188 ("Claim construction 'is not an inviolable prerequisite to a validity determination under § 101.'" (quoting *Bancorp Servs.*, 687 F.3d at 1273)).

**B. Applying *Alice* Step Two**

In light of the Court's conclusion that the '633 Patent is directed to an abstract idea, it is necessary to proceed to step two of the *Alice* inquiry, which asks whether the claims contain an "inventive concept." *Alice*, 573 U.S. at 217.  Here, Guvera does not provide any non-conclusory allegations that the '633 Patent claims an inventive concept sufficient to transform it into a patent-eligible process. *See* SAC ¶ 12.  Instead, Guvera cites only "routine steps," *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 911 (Fed. Cir. 2017), which do not go significantly beyond instructions for implementing the abstract idea of content matching on a

14

computer, *see BASCOM*, 827 F.3d at 1349; *see also Quantum Stream*, 309 F. Supp. 3d at 188 ("[T]asks that are implemented by generic computer system arrangements but that a human operator, even with a pencil and paper, can also perform in real-time with the assistance of a device to implement the human's commands typically do not, without more, entail an inventive concept and thus are unpatentable.").

Guvera argues that the inventive concept embedded in the patent is a method for "computationally analyzing and processing data in real-time based on set parameters to provide targeted non-disruptive advertising." Pl.'s Opp'n 18; *see also* SAC ¶ 11. But that does not add "something more" to the abstract idea of content matching. *PersonalWeb Techs. LLC*, 8 F.4th at 1318 (internal quotation marks omitted). Indeed, in *PersonalWeb*, the Federal Circuit rejected a similar argument that using cryptographic hashes (a type of content identifier) to provide data to users based on certain limitations added an inventive concept. *See id.* at 1319. As the court explained, the method simply applied a computer to make an otherwise conventional process more efficient. *See id.* Similarly, the district court in *Quantum Stream* held that patents claiming the conventional implementation of tailoring advertising to user characteristics lacked an inventive concept; the patents essentially used a computer to implement "the abstract idea of customization" in "real time." 309 F. Supp. 3d at 187. "Even if the patents' system arrangements envision a more elegant or efficient system for creating custom advertising . . . the relevant 'precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility.'" *Id.* (quoting *Intellectual Ventures*, 792 F.3d at 1370).

Guvera's arguments fail for the same reasons. The '633 Patent utilizes three databases — a routine function on a computer. Patent 12:62-13:5. It next requires a brand client to select

15

content pieces that represent its identity — a mental process that can be completed by a human. *Id.* at 13:6-8. Then, a computer tests the selected content against certain constraints to ensure that there are enough content pieces or types of content in the selection — again, a routine computer function. *Id.* at 13:9-29. The computer processor or the system administrator assigns tags and values to the content pieces and then, to generate the matched content, compares them to the values of different content pieces — also a routine function. *Id.* at 13:44-65. The dependent claims add no inventive concept, but rather merely specify the type of data associated with each content piece and how a brand client may direct the creation of a matched content pool. *Id.* at 14:1-13, 14:17-21, 14:29-37, 14:48-51. At bottom, the claims recite the process for implementing the abstract idea of matching content on a computer. Indeed, at best, the patent improves the efficiency of content matching and adds nothing that could qualify as an inventive concept. Once again, Guvera implicitly acknowledges as much. It argues that the '633 Patent provides an improvement to a prior method of capturing and analyzing content that "was cumbersome and inefficient." Pl.'s Opp'n 18; SAC ¶ 13. Adding speed and efficiency to an otherwise conventional process, however, does not qualify as the requisite inventive concept.

Contrary to Guvera's assertions, *see* Pl's Opp'n 21, the Second Amended Complaint does not allege what inventive concept the '633 Patent contains or what "unconventional technological solution" it provides to a "technological problem." *Island Intellectual Prop., LLC v. StoneCastle Asset Mgmt. LLC*, 463 F. Supp. 3d 490, 499 (S.D.N.Y. 2020). Guvera does not, for example, allege how its process for matching electronic content comprises an improvement in the technology, except to explain that it has automated the process. *See Alice*, 573 U.S. at 225 (noting that the method claims fail to "effect an improvement in any other technology or technical field"); *cf. Cellspin Soft*, 927 F.3d at 1316-17 (finding that a process for capturing,

transferring, and publishing data had an inventive concept, namely making data capture devices smaller, simpler, and cheaper to build). Guvera does claim that its patent enables a system to "identify electronic content automatically" and to "provide targeted advertising . . . to a large number of users simultaneously." SAC ¶ 14. It further claims "a novel transactional model" for allowing consumers to access electronic content. *Id.* ¶ 16.[3] But, as described above, content matching and targeted advertising are abstract ideas. And even if they are novel, as Guvera contends, *see* Pl.'s Opp'n 17-19, "a claim for a new abstract idea is still an abstract idea," *PersonalWeb Techs.*, 8 F.4th at 1318 (cleaned up); *see also, e.g.*, *In re Morsa*, 809 F. App'x 913, 918-19 (Fed. Cir. 2020) (per curiam) (noting that "[n]ovelty of an invention" alone cannot "avoid the problem of abstractness" (quoting *Affinity Labs of Tex., LLC v. DIRECTV LLC*, 838 F.3d 1253, 1263 (Fed. Cir. 2016)). In short, there is no inventive concept in the '633 patent claims, the patent's specification, or Guvera's Second Amended Complaint.

## CONCLUSION

For the foregoing reasons, the '633 Patent's claims are directed to an abstract idea and thus not eligible for patent protection. Accordingly, Spotify's motion to dismiss must be and is GRANTED, and the Second Amended Complaint is DISMISSED.

Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend, *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019). Here, the problem with Guvera's claims is substantive, so amendment would be futile. *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases); *Ghaly*

---

[3]   As Spotify points out, the "novel transactional model" is not included in the claim limitations themselves. Def.'s Mem. 23. Therefore, this cannot supply "the inventive concept" in the patent claims.

*Devices*, 443 F. Supp. 3d at 434 (denying leave to replead where patent claims were found ineligible). Moreover, Guvera does not seek leave to amend or suggest that it is in possession of facts that would cure the problems with its claims. *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if [it] fails to specify how amendment would cure the pleading deficiencies in [its] complaint."); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014). Finally, the Court granted Guvera leave to amend in response to Spotify's first motion to dismiss and explicitly warned that it would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." ECF No. 31; s*ee, e.g.*, *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) ("Plaintiff's failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend *sua sponte*." (citing cases)). Accordingly, the Court declines to *sua sponte* grant Guvera leave to amend again.

The Clerk of Court is directed to terminate ECF No. 39, to enter judgment in favor of Spotify, and to close this case.

SO ORDERED.

Dated: September 28, 2022
      New York, New York

JESSE M. FURMAN
United States District Judge